HEATHER E. WILLIAMS, #122664
Federal Defender
RACHELLE BARBOUR, #185395
Assistant Federal Defender
OFFICE OF THE FEDERAL DEFENDER
801 I Street, 3rd Floor
Sacramento, CA 95814
916-498-5700
Rachelle.Barbour@fd.org

Attorney for Defendant
SHASTA LEA SCHNITTKER

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:23-cr-0125 KJM |
| Plaintiff, | ) | SENTENCING MEMORANDUM |
| v. | ) | Date: August 26, 2024 |
| | ) | Time: 9:00 a.m. |
| SHASTA LEA SCHNITTKER, | ) | Chief Judge Hon. Kimberly J. Mueller |
| Defendant. | ) | |

**TABLE OF CONTENTS**

I.      INTRODUCTION...................................................................................................... 1

II.     SHASTA SCHNITTKER'S HISTORY AS A VICTIM OF REPEATED SEXUAL
        ABUSE SUPPORTS A SENTENCE OF FOUR YEARS.............................................. 1

III.    SHASTA'S CRIME IS DIRECTLY CONNECTED TO HER AUTISM AND THE
        SEVERE CHILDHOOD NEGLECT SHE SUFFERED .................................................. 7

IV.     SHASTA'S CONDUCT WAS LIMITED IN TIME AND MOTIVATED BY A
        SITUATION THAT WILL NOT REOCCUR............................................................. 12

V.      SHASTA USED ALCOHOL TO DULL HER EMOTIONS AND COMMITTED
        THESE OFFENSES WHILE UNDER THE INFLUENCE ........................................ 13

VI.     BECAUSE HER CONDUCT STEMS FROM THE TRAUMA CREATED BY HER
        SEXUAL ABUSE, FILTERED THROUGH HER AUTISM AND SEVERE
        CHILDHOOD NEGLECT, SHASTA IS UNIQUELY SITUATED TO BENEFIT
        FROM TREATMENT ............................................................................................ 14

VII.    A SENTENCE OF FOUR YEARS IS APPROPRIATE IN THIS CASE UNDER 18
        USC 3553 .......................................................................................................... 16

VIII.   CONCLUSION ..................................................................................................... 20

**TABLE OF AUTHORITIES**

**Cases**                                                                        **Page(s)**

*U.S. v. Knott*, 638 F.Supp. 1310 ............................................................ 17

*U.S. v. Walter*, 256 F.3d 891 (9th Cir. 2001) ........................................ 19

*United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) ........................ 16

*United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991) ........................ 19

*United States v. Hambrock*, 520 F. Supp. 3d 827 ............................ 17, 18

*United States v. Huseth*, 2021 WL 4940915 (D. Kan. Oct. 22, 2021) ........................ 17

*United States v. Mallat, No. 4:13cr3005*, 2013 U.S. Dist. LEXIS 168777, 2013 WL 6196946 (D. Neb. Nov. 23, 2013) ............................................................ 17

*United States v. Parish*, 308 F.3d 1025–33 (9th Cir. 2002) ........................ 18

*United States v. Prisel*, 316 Fed. App'x 377 (6th Cir. 2008) ................ 16-17

*United States v. Roe*, 976 F.2d 1216 (9th Cir. 1992) ........................ 19

*United States v. Shore*, 2020 U.S. Dist. LEXIS 118400 ........................ 15

**Statutes**

18 U.S.C. 3553 ............................................................ *passim*

## I.   INTRODUCTION

Shasta Schnittker is set for sentencing before this Court on August 26, 2024.  Ms. Schnittker pled guilty to one count of possession of child sexual abuse material.  There is no mandatory minimum, and the parties and the Probation Office agree that the guideline range is 97 to 121 months.  (PSR, Doc. 49, para. 101).  Shasta has no criminal history.  (Doc. 49, pp. 11-12.)  There are no formal objections.

In the plea agreement, the Government agrees to recommend no more than 97 months, the low-end of the range.  (Doc. 31, p. 7.)  Ms. Schnittker respectfully requests that the Court sentence her under 18 U.S.C. 3553(a) to a sentence of 48 months in light of the unique and tragic history and characteristics discussed below.

Ms. Schnittker is herself the victim of repeated child sexual abuse at the hands of multiple perpetrators.  (Exh. A [SEALED].)[1]  Those early experiences of rape and molestation were the only moments of intimacy in a childhood of profound neglect.  Ms. Schnittker, whose autism was never diagnosed as a child, interpreted these acts of predation as love.  Intelligent, inquisitive, detail-focused, and near obsessive in her desire to make sense of her fractured past, Ms. Schnittker gravitated to others who abused and degraded her while calling it love.  (Exh. D [SEALED].)  In doing so, she never understood herself as a victim, and thus continued the cycle at issue in this case.

Because that combination of conditions has led to this offense, Ms. Schnittker is uniquely situated not to be a danger to the community and to never offend again.  All of these factors strongly favor a sentence of four years, which adequately punishes Ms. Schnittker for her acts.

## II.   SHASTA SCHNITTKER'S HISTORY AS A VICTIM OF REPEATED SEXUAL ABUSE SUPPORTS A SENTENCE OF FOUR YEARS

Ms. Schnittker was born, autistic and partially deaf, on an isolated California cattle ranch to older parents who never nurtured her because they were combatting their own demons.  Her

---

[1] A request to seal this report and other Exhibits is being filed concurrently with this memorandum.

much older sister Rosemary remembers Shasta's childhood as one of profound neglect, marked by their father's severe alcoholism and their mother's profound disinterest in being a caregiver. (Exhs. F [SEALED] & G).

Rosemary, 14 years older than Shasta, had grown up surrounded by extended family members who stepped in to compensate for the parental neglect, but by the time Shasta was born, the family had moved to a rural, isolated ranch away from those support systems. (Exh. G). Shasta's older half-brothers had grown up and left the home. Shasta's much older half-brother David remembered that "at least Rosemary had me, but Shasta had no one."  (Exh. F, p. 7). Rosemary, a teen when Shasta was born, remembered Shasta being "pretty much alone" all the time.  Id.

Unsurprising then, that Shasta was vulnerable to the sexual attention of abusers.  To Shasta, beginning when she was only eight years old, this sexual abuse felt like love, safety, and friendship – she simply did not know any better.  First an older girl ("T") began to pay Shasta attention, first dominating and bullying Shasta, then befriending her only to repeatedly abuse her sexually.  Shasta learned that compliance with the sexual abuse gained her a "friend" and brought her safety at school.

T repeatedly and regularly molested Shasta in a hay barn on the ranch for a period of eight months. (Ex. F, p. 11.)  Shasta remembers that after a while she "leaned into the experience" with T, because it filled a void in her life, the need to be touched, wanted, and needed. Id.  Shasta had no other way to understand and process this experience.  She was too young to understand that she was a victim of inappropriate touching and that it was not her fault. In fact, when the hay barn burned down a few years later, Shasta (only 10 years old at the time) believed that her actions with T caused the fire and was so terrified that she needed to be taken away from the scene.  Id.

Several years later, Shasta fell prey to Bob Nylund, an adult who raped her and infected her with chlamydia when she was about 13 years old.  Nylund was also sexually abusing his own sister, who was one of Shasta's only friends at school.  The ongoing abuse of Shasta and her

friend came to light when the girls fought over Nylund at school, each believing that she was the one he was truly in love with.  Nylund was prosecuted and convicted in Siskiyou County of raping both Shasta and her friend.[2]  (Doc. 49, paras. 63, 64.)  In Shasta's small town, and for her extremely Catholic parents, that meant that she was ruined.  The crime was so shameful that Shasta's parents never told her older sister about it. (Exh. G). When Rosemary later learned of the assault as an adult, she understood how thoroughly her parents "swept it under the rug," and how, without closure, this abuse continued to haunt Shasta the rest of her life. Id.

Shasta still remembers attending Nylund's sentencing 25 years ago and hearing her father refer to her as "damaged goods" as he advocated for Nylund's punishment.  Shasta's parents – who had never expressed any love or affection for her, and who had failed to recognize her autism or seek any care or support – completely wrote her off after the rape.  Meanwhile, Shasta felt guilty for Nylund's prosecution and punishment because she believed him when he told her that she had "seduced" him.  Shasta continues to feel guilty for this today while also intellectually trying to understand that she was not responsible for what happened.

Accordingly, from childhood, Shasta had to try to figure out a way forward in a world where friendship, affection, nurturing, protection, and sexual abuse had been fused.  As Shasta told undersigned counsel, she recognizes that she was broken as a child, and "put herself back together wrong."  This toxic combination of childhood sexual victimization and autism was to determine the course of Shasta's intimate life, while in every other aspect of her life she progressed impressively in her education and career.  (PSR, Doc. 49, paras. 87-90.)

Going forward, Shasta was vulnerable to a series of other predatory men: Shasta's German high school boyfriend, who raped and abused her under the cover of kinky sex; Shasta's much older college professor, who used her sexually and then threw her away; Shasta's first husband, who used her to immigrate to the USA from China and then beat her, strangled her, and

---

[2] Nylund is a registered sex offender who still lives in Siskiyou County.  As an example of how Shasta's life has circled back on itself, Nylund is currently housed in Siskiyou County jail with Shasta's husband, Tony Jimenez, who is on trial.

raped her.  Paradoxically, the violent sexual abuse Shasta experienced as an adult made her "nostalgic" for the non-violent sexual abuse she experienced as a child.  She still carried her misguided childhood conviction that she had been the one to seduce her abusers.  She still believed that she had been loved and cherished by them, because she had never experienced being loved and cared-for.

After being raped and strangled by her ex-husband in early 2016, Shasta felt like her life was unraveling.  (Exh. A, p. 9 [SEALED].)  It was Shasta's attempt to try to unpack the abuse she suffered and her challenging and unwelcome sexual feelings that led her to this offense.  Shasta was working as a data analyst reviewing research on childhood sexual abuse and was unable to escape reminders of her past trauma.  Much of this research described "typical" victims of CSA as succumbing to the abuse under threat or fear of violence.

Because genuine love had been missing from her early life, Shasta remembered her own abuse differently: as a rare spot of affection in a childhood that was otherwise defined by neglect and loneliness.  She began to wonder, "Was my experience less abusive because I enjoyed it? Is there something more wrong with me because I sought it out?"

It was while researching these concerns online that she first came across "Virtuous Pedophiles."  She started out on the site wanting to understand why people abused children in a quest to understand to why she herself had been abused.  However, when she told members on the site about her own childhood abuse, she was taken in by their reaction.  Suddenly, the broken parts of her were celebrated, because in some ways she validated what others on that website wanted to think about their victims.  For Shasta, perpetually unloved, this validation affirmed the deepest, most shameful parts of her past, but also set off a cycle that led to this case.[3]

The member of Virtuous Pedophiles told Shasta that because her sexual experiences as a child were so central to her sexuality, she was a pedophile too.  As Shasta described it to

---

[3] Psychological testing conducted by Ms. Griffin confirmed that Shasta's early trauma has led to "a tendency to rely on other people for information about self, and a great susceptibility to influence by others."  (Exh. A, p. 11 [SEALED].)

undersigned counsel, before she found Virtuous Pedophiles, she had no "definition" for what she felt her problem was.  She had never received therapy that would have framed her persistent memories of childhood sexual experiences differently, as a symptom of trauma.  All of her sexual experiences felt defined by her memories of childhood abuse, but she did not feel any attraction to children.  This is confirmed by Ms. Griffin's testing, which concluded, "It is recognized Ms. Schnittker struggles with excessive worries related to sexual interest in prepubescent children; however, her obsession is more related to her mental health issues and her unresolved trauma history than actually a pervasive sexual interest in prepubescent children." (Exh. A, p. 13 [SEALED].)

Shasta's rigid thinking – compelled by her autism – made it impossible for her to accept ambiguity.  She needed to find a "solution," and the potential solution she found was proposed by men eager to take advantage of her.  She began to believe the men she met online when they told her that because her intimate life felt defined by memories of having sex as a child and with a child ("T"), that made her a pedophile. Shasta's obsessive nature (a symptom of her autism), along with her susceptibility to the influence of others (as evidenced by her lifelong experiences and validated by psychological testing), and her naïve understanding of social interactions (because of her autism and early childhood neglect), meant that where others would have fled a self-diagnosis of pedophilia, Shasta embraced it even if it did not actually apply.

Childhood trauma and sexual abuse like Shasta experienced growing up are common among female sex offenders. Susan Strickland, *Female Sex Offenders: Exploring Issues of Personality, Trauma, and Cognitive Distortions*, 23 J. Interpersonal Violence 474, 483 (2008). Childhood sexual abuse in females is linked to the development of low self-esteem and role confusion, in which female victims of childhood sexual abuse infantilize themselves. Id.; Pamela C. Alexander, *et al.*, *Childhood Sexual Abuse History and Role Reversal in Parenting*, 24 Child Abuse & Neglect 829 (2000). Several studies have recognized this "unique and significant" development among female sex offenders. Strickland (2008). Coupled with autistic tendencies to create a self-image that is younger than their calendar age, this phenomenon is particularly

Schnittker – Sentencing Memorandum                    5

exaggerated in Shasta's case. Mary R. Cohen, *Autism, Online Offending, and Victimization*, Autism Spectrum News (2023)[4]; Isabelle Henault, *Sex Education and Intervention, in* The Autism Spectrum, Sexuality, and the Law: What Every Parents and Professional Needs to Know (Tony Atwood, *et al.* eds., 2014).

In her evaluation, Ms. Griffin found that Shasta's offense behavior was a direct result of her chronic experiences of abuse and victimization, use of substances to cope, difficulties meeting intimacy needs (emotional and sexual), and dependent relationships with deviant males. (Exh. A, pp. 17-18). Her trauma also made her more inclined to impulsive behavior and risky coping mechanisms, including unsafe sexual behavior. (Exh. A, p. 11). Shasta's difficulties with self-regulating, her alcoholism, and a lifetime of abuse and isolation that distorted her perceptions of child-adult boundaries, were all foundational contributors to her offense behaviors. (Exh. A, pp. 15-16). However, all these factors are also readily addressed by therapy, rehab, and trauma-informed sex offender treatment, making Shasta very low risk for recidivism. (Exh. A, pp. 18).

When Shasta discovered Virtuous Pedophiles, she stepped into an identity that made sense for her past and her emotions. She naively believed the "virtuous" part – and had never had a truly virtuous or positive relationship to gauge it against. As part of her awkward attempt to understand herself, she self-diagnosed as a "pedophile" even though it is clear that she deeply identified as the abused child, not as the abusive adult. In part because of her autism, she sought a concrete label that made sense of all the roiling emotions she had been carrying for decades. Over and over in Shasta's relationships, she engaged with a much more powerful partner, replicating many of the dynamics she learned as a child – domination, physical control, and bullying. Shasta's history of trauma and abuse set her on the path that led her to this case, but they also mitigate the need for a harsh sentence under 18 U.S.C. section 3553(a)(1)(history and characteristics of the offender).

---

[4] Available at  https://autismspectrumnews.org/autism-online-offending-and-victimization/

### III.     SHASTA'S CRIME IS DIRECTLY CONNECTED TO HER AUTISM AND THE SEVERE CHILDHOOD NEGLECT SHE SUFFERED

Shasta Schnittker was never "normal" but did not understand why until recently.  Her sister, Rosemary Gray, fourteen years older, remembers that Shasta had trouble with her speech and did not receive the attention, affection, or basic stimulation that most children are exposed to. (Exhs. F & G.)  Shasta's mother, likely autistic herself, failed to bond with her baby, and Shasta's father ignored his children in favor of binge drinking. *Id*.  Young Shasta grew up extremely isolated on the family farm.  It was only when Shasta started kindergarten that she began to interact with other children, and that went badly.  (Exh. F, p. 9.)  Shasta had been so isolated as a child with so little social interaction, she had a hard time connecting with the other children. She was often bullied in school for being different.  (Exh. F, p. 11.)  She remembers that the other children in school treated her like she "was a disease" (Exh. D, p. 3). Shasta was held back twice in kindergarten because her teachers were concerned that she seemed unable to make friends and had frequent meltdowns. (Exh. F, p. 5).

Older sister Rosemary reported that as a child, Shasta "didn't seem to know how to act or behave around people." (Exh. G). She didn't have good communication skills and couldn't understand jokes or sarcasm because she took everything literally. Id. As Rosemary put it, "She was so book smart, but could hardly put it together with common sense." Id.  Shasta struggled to read body language or understand how other people felt about her. Id. She would become obsessed with a certain topic and be able to talk about nothing else for long periods of time. Id. Despite her struggles, she always tried to please people and did not "have a mean bone in her body." Id.

As she got older, her social problems persisted.  A high school friend of Shasta's, "D," remembers that Shasta's only friends were a group of "100% neurodivergent women."  She reported that Shasta had a hard time maintaining these friendships because she was easily influenced by men and often chose romantic partners who isolated Shasta from what few friends she had.  D remembers that Shasta would abandon her own life to engage completely with her boyfriends' interests, going so far as to learn new languages or convert religions for them.

Schnittker – Sentencing Memorandum                                    7

1    Sometimes this included sexual interests that D worried Shasta was only consenting to in order

2    to please her partners.  As D kept up with Shasta's life into adulthood, she was always worried

3    that Shasta's unhealthy submission to her partner's desires would make her easy to take

4    advantage of.[5]

5          Despite the many behaviors flagging her neurodivergence, no one – not her parents nor

6    the small school district in which she was educated – had Shasta evaluated for learning and

7    social difficulties that would have revealed her autism.  However, Shasta's autism was

8    immediately apparent to Elizabeth Griffin, an expert in the evaluation of women charged with

9    sex offenses, who also evaluated Shasta for autism based on how she acted interpersonally.

10   (Exh. A [SEALED].) This report was provided to Probation prior to the filing of the final PSR

11   and is discussed at paragraphs 79 to 84.

12         Shasta's provisional diagnosis of autism then led defense counsel to obtain a more

13   focused evaluation by Dr. Kimberly Miller, who diagnosed Shasta with autism of the mild

14   variety. [6] (Exh. D). With that diagnosis, many of the issues in this case, including Shasta's

15   extensive writings about her past victimization and her ongoing attempts to deal with that

16   trauma, snapped into focus.

17         The connection between autism and child pornography offenses is well documented.

18   Researchers have determined certain autistic characteristics create a greater risk for sexual and/or

19   online offending, making autistic individuals more likely to enter the criminal justice system for

20   those offenses. Melanie Mogavero, *Autism, Sexual Offending, and the Criminal Justice System*, 7

21   J. Intellectual Disabilities and Offending Behaviour 116, (2016); Cohen (2023).  These studies

22   indicate that many of these individual's offenses are due to their ASD symptoms as opposed to

23   malice. Id. Common ASD characteristics that drive offenses include social isolation, trauma,

24   _____

25   [5]      The Defense spoke to D recently.  Because of the social stigma involved in this case and
     the small town that they grew up in, D provided additional confirmation regarding Shasta's
26   childhood and teen years but asked that only her first initial be used in this memorandum.

27   [6]  This was previously called Asperger's before that term was folded into the broader autism
     spectrum. Seyed Alireza Hosseini & Mohammed Molla, Asperger Syndrome (StatPearls
28   Publishing 2024) available at https://pubmed.ncbi.nlm.nih.gov/32491480/.

insufficient sexuality education and support, the need for community, and a self-image that is younger than their calendar age. Cohen (2023); Henault (2014). The result is that ASD individuals who view child pornography appear to be "genuinely unaware of the harm they caused their victims." Daniel Murrie et al., *Asperger's Syndrome in Forensic Settings*, 1 Int'l J. Forensic Mental Health 59, 66 (2002).

In Shasta's case, her autism played into this offense in many ways.  It socially isolated her from birth, through childhood, as a teen, and then as an adult.  Shasta's mother – a victim of sexual abuse and likely autistic herself – simply could not bond with her autistic baby.  Shasta had to basically raise herself on a cattle ranch without experiencing nurturing, love, cuddling, or any other positive non-sexual intimacy.  As neuroscientist Dr. Rachel Wurzman explains, "Loneliness creates a hunger in the brain which neurochemically hypersensitizes our reward system.... If we don't have the ability to connect socially, we are so ravenous for our social neurochemistry to be rebalanced, we're likely to seek relief from anywhere." TEDTalk, How Isolation Fuels Opioid Addiction (2018).[7]  Shasta spent her whole early life isolated from healthy forms of love, affection, and social connection.  When sexual abusers entered her life, she was extremely vulnerable to them – emotionally and physically.

The sexual naivete associated with ASD increases ASD individuals' risk of becoming a victim of sexual abuse as well as the chance that they may display inappropriate sexual behavior. Henault (2014). However inappropriate, this early sexual abuse was *all* Shasta knew of human connection, and her autism made it difficult for her to learn otherwise.  Her parents' response did not help.  Rather than help Shasta, they told her and the world that she was "damaged goods."

As she aged into adulthood, her sexual behaviors reflected this experience. Her fantasies have consistently centered around a theme in which she was the child being sexually abused by an adult.  Her adult relationships have all involved abuse of some kind: Bondage and kinky sex in the case of her high school boyfriend; choking and rape by her first husband; and finally,

---

[7] *Available at*
https://www.ted.com/talks/rachel_wurzman_how_isolation_fuels_opioid_addiction?trigger=15s

marriage to her current husband, who is 23 years older than her and a previously convicted sex offender.  In finding him, she reenacted her relationship with Bob Nylund, the older man who "loved" her so much when she was 13 years old.

This is unfortunately not unheard of for autistic individuals. Because autistic individuals are more likely to be victimized due to their naivete and more likely to relate to younger children than their peers due to social limitations, researchers suggest that the interest of an autistic person in child pornography has less to do with deviance and more to do with trying to understand their own sexuality. Tony Attwood, The Complete Guide to Asperger's Syndrome (2007); Henault (2014). For Shasta, this interacted with other autistic traits, namely hyper-fixation and rigid thinking.

Dr. Miller documented in her evaluation of Shasta that she was "concrete in nature" and displayed "behavioral rigidity." (Ex D, p. 7). She also noted that Shasta has a history of autistic "special interests," in which she becomes highly fixated on a topic. (Exh. D, p. 9). These traits are all well-documented ASD characteristics. *See, e.g.*, Valentini Petrolini, et al., *What Does It Take to be Rigid? Reflections on the Notion of Rigidity in Autism*, 14 Frontiers in Psychiatry (2023); Agustin Vincente & Ingrid Lossius Falkum, *Accounting for the Preference for Literal Meanings in Autism Spectrum Disorders*, 38 Mind & Language 1 (2021); Chloe Jennifer Jordan & Catherine Caldwell-Harris, *Understanding Differences in Neurotypical and Autism Spectrum Special Interests Through Internet Forums*, 50 Intellectual & Developmental Disabilities 391 (2012). The preoccupation that often comes from these special interests can hinder ASD individuals' ability to "appreciate the wider implications and potential consequences" of their actions when engaging with the object of focus. Clare Sarah Allely & Larry Dubin, *The Contributory Role of Autism Symptomology in Child Pornography Offending: Why There is an Urgent Need for Empirical Research in this Area*, 9 J. Intellectual Disabilities & Offending Behavior 129, 135 (2018).

This focus to understand her own sexual abuse brought Shasta to "Virtuous Pedophiles" which then played right into the black-and-white notion that she had already started to form

about herself: that something was seriously wrong with her because she had not fought back against her abusers. Her concrete and rigid thinking led her to self-diagnose as a pedophile because pedophiles online told her she was one.

This is in line with research suggesting that autistic individuals are more suggestible and rely on social cues provided by others to dictate their behavior. Joan Petersilia, *Doing Justice? The Criminal Justice System and Offenders with Developmental Disabilities*, California Policy Research Center (2000).[8]  This can sometimes lead an autistic individual to say things that are untrue because of a desire to please others. *Id.* at 53.

Dr. Miller found in her evaluation of Shasta that she is particularly vulnerable to these "people-pleasing" tendencies because she is naive, lacks "street smarts," and her "lack of social awareness combined with her need to be liked puts her at risk for potentially being manipulated or abused by others." (Exh D, p. 11 [SEALED].)  This is what happened with Tony Jimenez in this case.  ASD individuals, especially girls and women, often mirror their peers' interests in an effort to form social connections, and their disconnect from social taboos sometimes make it difficult to appreciate when their peers' interests are harmful. Rynkiewicz, et al., *Girls and Women with Autism*, 53 Psychiatria Polska 737, 739 (2019); Downie, et al., *Sex/Gender Differences in Camouflaging in Children and Adolescents with Autism*, 51 J. Autism and Developmental Disorders 1353 (2021); A. Creaby-Attwood & C.S. Allely, *A Psycho-legal Perspective On Sexual Offending in Individuals with Autism Spectrum Disorder*, 55 Int'l J. Law and Psychiatry 72, 74 (2017) (highlighting a case where an ASD-diagnosed boy participated in a group sexual assault of a peer to fit in with his first age-appropriate friends, not realizing it was harmful).

Like many ASD-diagnosed women, Shasta developed a pattern of mirroring partners' interests to earn acceptance and prevent abandonment. Both Ms. Griffin and Dr. Miller noted this pattern in their evaluations. (Exhs. A & D). Dr. Miller noted that this stems from "a lifetime of

---

[8] Available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/doing-justice-criminal-offenders-developmental-disabilities-0, at 12, 23

traumatic experiences combined with fundamental difficulty understanding social rules and interactions that is seen characteristically as part of autism spectrum disorder." (Exh. D, p. 9).

Tony Jimenez encouraged Shasta's participation in this crime by telling her that he had been sexually abused as a child and made the subject of child porn, but that he had enjoyed it, so other children must too. Autism made it difficult for Shasta to interpret the emotions and expressions of the children in the illegal images Tony showed her. Keiran Rump, *et al.*, *The Development of Emotion Recognition in Individuals with Autism*, 80 Child Development 1317, 1435 ("Adults with autism never seem to attain the levels of proficiency at emotion recognition of typically developing adults."). Shasta assumed they were happy because that is what Tony told her they felt. She reported later that she did not understand that the victims of child pornography feel harmed every time someone views their abuse material. (Exh. A, p. 9). In her naivete, influenced by her autism and her complicated emotions surrounding her own childhood abuse, she believed the toxic narratives about minor victims of sexual abuse spun for her by Tony and Virtuous Pedophiles. Isolated now from those influences, Shasta has a clear view of the harm she caused and has lived with profound remorse ever since her arrest.

## IV.   SHASTA'S CONDUCT WAS LIMITED IN TIME AND MOTIVATED BY A SITUATION THAT WILL NOT REOCCUR

The illegal images at issue in this case were still possessed on digital storage devices in 2022, but they were obtained by Shasta in April 2016 in connection with her early online communications with Tony Jimenez.  (PSR, Doc. 46, paras. 8 & 11 [discussing images obtained in 2016].)  This was in the months after she had been raped and strangled by her prior husband and had left him.  (PSR, Doc. 46, para. 67.)  Shasta was drinking herself into a blackout ever night at this point.  (Exh. F, p. 21).  The chats discussed in the PSR date from early 2016 before Shasta and Tony met in person.  Once Shasta met Tony in real life and began a relationship with him in late summer of 2016, she stopped going online for these types of images.[9]

---

[9] Forensic evidence of more recent involvement with illegal images was associated with Tony Jimenez's profiles and computers, not with Shasta.

In her journals, Shasta wrote that she downloaded this material in 2016 because "I wanted to impress Tony, and I wanted him to like me more." (Exh. A, p. 9).  Ms. Griffin connected this mentality to research that found female sexual offenders often sexually offend to obtain a sense of intimacy with a male co-perpetrator and are often otherwise socially isolated around the time of their offense. (Exh. A, p. 15).  As discussed above, in 2016 Shasta had gone online in an attempt to understand herself and her past, only to fall into an online forum for "Virtuous Pedophiles" who convinced her that she was one of them.  Shasta's experiences of adult relationships had been uniformly abusive and manipulative to that point.  She was extremely vulnerable to the additional manipulation she felt on that forum, and desperate to find some sense of belonging among people who she believed understood her past abuse.

## V.    SHASTA USED ALCOHOL TO DULL HER EMOTIONS AND COMMITTED THESE OFFENSES WHILE UNDER THE INFLUENCE

Like her father, Shasta Schnittker is an alcoholic. She first started drinking at the age of 9, after repeatedly being sexually molested by an older child.  (Exh. F, p. 9). From young adulthood she drank alcohol daily, sometimes with a suicidal mindset.  During the day, Shasta could function well in society, but in the evenings, isolated with the demons unleashed by her prior abuse, she drank to excess to numb herself.

Some of the recovery writings seized by law enforcement and provided in discovery come from her treatment at the Ukiah Recover Center, after her initial arrest. In her recovery writings, Shasta acknowledges the large part that alcoholism played in this offense, writing, "I have never consumed CP [child porn] sober, and it's another reason why recovery and sobriety are so important to me."  Shasta knows sobriety is a steppingstone to taking accountability for the harm she has caused others and moving forward in a healthy direction.  Shasta requests that the Court recommend her participation in the BOP's DAP program to continue her recovery and sobriety.

**VI.    BECAUSE HER CONDUCT STEMS FROM THE TRAUMA CREATED BY HER SEXUAL ABUSE, FILTERED THROUGH HER AUTISM AND SEVERE CHILDHOOD NEGLECT, SHASTA IS UNIQUELY SITUATED TO BENEFIT FROM TREATMENT**

It is clear is that Shasta is extremely open to the type of self-reflection that minimizes any risk of re-offense.  Rather trying to minimize her actions, Shasta is fully aware of how her damaged past has led to her participation in the market for abusive pictures of other victims just like her.  It appears that the Probation Office considers this to be an aggravating factor (PSR, Doc. 49-1, p. 2), while in fact it is a mitigating one.  The journal that the Probation Office cites as aggravation was written years after the offense conduct when Shasta was in sex offender, substance abuse, and mental health treatment and, for the first time, receiving professional therapy.  It is unclear how her growing understanding and acceptance of criminal responsibility *during mental health treatment* years after her offense justifies any increase in punishment.

Prior to being charged with any offense, Shasta checked herself in for an in-patient alcohol treatment program, as she recognized that her alcoholism facilitated and fueled her behavior.  Further, Shasta voluntarily started sex offender treatment out of custody in October 2022 with therapist Dawn Horowitz-Person, who specializes in treating sex offenders and the victims of sexual abuse.  This treatment was in addition to the CPS sponsored mental health treatment she was already receiving and that ended when she went into custody.

Shasta went through all her therapy as she goes through life with autism – she has no filter and was always brutally honest with herself and her treatment providers about where her history of neglect and abuse had led her.  Law enforcement seized these treatment records in June and November 2022, and many of them have been produced to the defense in discovery.  It may be that law enforcement saw these journals and records as negative because they confirmed Shasta's involvement in this offense, but in fact they are a testament to Shasta's willingness to ask herself the hard questions and rigorously and honestly answer them.

It has been eight years since Shasta downloaded these images. (Doc. 49, para. 8, 9, 11, 13). Since law enforcement became involved in early 2022, Shasta has strived tirelessly to find healthy ways to cope with her past trauma in recognition of the impact it had on her behavior.

Both Elizabeth Griffin and Kimberly Miller found that Shasta would be amenable to treatment. (Exhs. A & D). Ms. Griffin also found that Shasta is a "low risk for any criminal and/or sexual offense behavior in the future" and that this risk would be even further lowered by continued mental health treatment (Exh. A, p. 16-17). Dr. Miller wrote that Shasta "shows a high likelihood for engagement in treatment and a motivation for appropriate treatment. Ability to engage in treatment is bolstered by her desire to understand herself and her higher-than-average intelligence" (Exh. D, p. 10).

The Federal system puts great faith in sex offender treatment programs. The evidence suggests that certain therapeutic interventions for sex offenders can and do work. Specifically, the cognitive-behavioral approach, which is used in BOP facilities, has been found effective at reducing sexual recidivism. Roger Przybylski, U.S. Dep't. of Justice, The Effectiveness of Treatment for Adult Sexual Offenders 4 (2015).[10]  Shasta's treatment records make it clear that she engaged fully in trying to understand herself, her past, her feelings, and a path forward. This makes her a great candidate for the sex offender treatment programs provided in the Federal system.

Research shows that female sex offenders in general demonstrate extremely low rates of sexual recidivism, with an average rate of 0.8-1.4% across various studies. Franca Cortoni, Women Who Sexually Abuse: Assessment, Treatment, & Management 85 (2018). Additionally, "autistic persons have traits that militate against risks for reoffending. Those traits — rigid adherence to social rules once learned — make them highly unlikely to reoffend." *United States v. Shore*, 2020 U.S. Dist. LEXIS 118400 (E.D. Penn. 2020) *18. There have been no major studies documenting recidivism rates among autistic offenders, but the autistic traits referred to by the *Shore* court (i.e., strict adherence to rules) have been well documented. Petrolini, et al. (2023); Vincente & Falkum (2021).  Upon her release, Shasta will also be eligible to obtain

---

[10]  Available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/theeffectivenessoftreatmentforadultsexualoffenders.pdf

services through the California Regional Centers, that provide additional appropriate training and therapy to neurodivergent individuals, including on relationship and sexual intimacy issues.

Non-production child pornography offenders also tend to have very low rates of sexual recidivism, only 4.3% in the most recent U.S.S.C. report. U.S. Sentencing Commission, Federal Sentencing of Child Pornography: Non-Production Offenses 65 (2021).[11] Shasta's demonstrated willingness and capacity to engage faithfully in treatment taken together with research on recidivism in female sexual offenders, autistic offenders, and non-production CSAM offenders supports a 48-month sentence in this case.

## VII.   A SENTENCE OF FOUR YEARS IS APPROPRIATE IN THIS CASE UNDER 18 USC 3553

There can be no doubt that Shasta is an incredibly unusual defendant for this type of offense for all the reasons set forth above.  The factors discussed above are extraordinary – in their impact on this case and in the toxic way in which they combined so that a law-abiding, intelligent, and hard-working woman finds herself a federal sex offender looking at years in prison.  Any of the above factors, taken alone, would surely mitigate the harsh effect of the guidelines, but taken together they strongly support a sentence of four years in this case.

An increasing number of judges are issuing and upholding below guidelines sentences for child pornography offenses in recognition of research suggesting (1) that there is not a statistical relationship between CSAM offenses and contact sexual offenses, and (2) that as technology developments change the nature of the offense, the sentencing guidelines become increasingly punitive towards CSAM offenses. Richard Wollert, The Implication of Recidivism Research and Clinical Experience [12] Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission (Feb. 15, 2012). *See also, e.g.*, *United States v. Duhon*, 541 F.3d 391, 399 (5th Cir. 2008); *United States v. Prisel*, 316 Fed. App'x 377,

---

[11]  Available at https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses.

[12] Available at https://www.ussc.gov/policymaking/meetings-hearings/public-hearing-february-15-2012

Schnittker – Sentencing Memorandum                                        16

385 (6th Cir. 2008) (upholding below guideline sentence because defendant showed he had already been adequately deterred from re-offense by pretrial detention and did not pose a danger to the community).

This is especially true when the defendant is ASD-diagnosed. *See, e.g.*, *United States v. Hambrock*, 520 F. Supp. 3d 827, 834 (E.D. Va., 2021) (acknowledging that for an autistic individual convicted for child pornography, "any custodial sentence was greater than necessary to serve the goals of sentencing" and resentencing to 48-months home detention); *United States v. Mallat*, No. 4:13cr3005, 2013 U.S. Dist. LEXIS 168777, 2013 WL 6196946 (D. Neb. Nov. 23, 2013) (sentencing a 31-year-old with ASD to time served for possession of child pornography); *United States v. Carpenter*, No. 6:08cr6256 (W.D.N.Y. June 17, 2009) (imposing probation for a defendant with ASD in a child pornography case); *United States v. Joy*, No. 1:07cr187 (N.D.N.Y. July 28, 2008) (imposing one day time served for defendant with ASD on child pornography charges); *United States v. Huseth*, 2021 WL 4940915 (D. Kan. Oct. 22, 2021) (declaring a probation sentence with treatment and therapeutic conditions tailored to his ASD was sufficient but not greater than necessary punishment for an ASD-diagnosed defendant in a CSAM case); *U.S. v. Knott*, 638 F.Supp. 1310, 1320 (M.D. Ala., 2022) (finding a sentence of 27-months home detention appropriate in a CSAM case because defendant's ASD diminished his moral culpability and made him susceptible to abuse in prison).

One factor in the decisions in these cases is that "Autistic people ... often have difficulty understanding prison rules and norms, making them especially vulnerable to exploitation in prison" and the resulting "disproportionate exposure to violence, sexual or otherwise." Chiara Eisner, Prison Is Even Worse When You Have a Disability Like Autism, The Marshall Project (Nov. 2, 2020).[13] *See also*, S.M. Brown-Lavoie, *et al.*, *Sexual Knowledge and Victimization in Adults with Autism Spectrum Disorders*, 44 J. Autism & Developmental Disorders 2185 (2014). Shasta has already been threatened at the jail because of her charges.

---

[13] available at https://www.themarshallproject.org/2020/11/02/prison-is-even-worse-when-you-have-a-disability-like-autism.

Researchers have concluded that lengthy custodial sentences are "simply not appropriate for a person with Asperger's." Sharon Patrick, *Adults and Adolescents with Asperger's Syndrome*, 14 Wisconsin Defender 1 (2006). In alignment with this finding, courts have acknowledged that imposing such lengthy sentences on ASD-diagnosed individuals, even for sexual offenses, would result in "unwarranted sentencing disparities after considering defendants similarly situated." *Hambrock*, 520 F. Supp. 3d at 834.

Shasta demonstrates the autistic characteristics that form the basis for researchers' concerns, namely a direct manner and difficulty interpreting others' intentions. These are the very characteristics that have made her vulnerable to abuse and exploitation her whole life. The Ninth Circuit has held that susceptibility to abuse in prison does in some cases justify a downward departure. See *United States v. Parish*, 308 F.3d 1025, 1032–33 (9th Cir. 2002) (affirming, in a child pornography case, a downward departure where defendant was susceptible to abuse in prison based on his stature, demeanor, naiveté, and the nature of the offense). Shasta's demonstrated autistic traits make her particularly susceptible to abuse and manipulation, including in prison. (Exhs. A & D).

Shasta has already experienced this while on federal hold at Sacramento County Jail. She told undersigned counsel, "People tell me to be less trusting in here, but I don't know how to live that way." She says that other inmates have told her she's like a child or a "fool." They know she has trouble saying no because of the naivete and "people-pleasing" tendencies associated with her autism, and they take advantage of this to steal her food and personal items. Shasta's difficulty with social cues and filtering her thoughts before she speaks have led to her victimization.  Shasta continually violates the unwritten social rules of incarceration, such as when she corrected another inmate's grammar, leading to a very strong response by the other inmate. As Shasta has experienced, incarceration when one is autistic goes beyond traditional punitive goals; it turns the pre-existing difficulties of day-to-day life with a disability into volatile and potentially violent interactions.

1   Even pre-*Booker* cases recognized that it was reasonable to consider a defendant's history

2   of childhood sexual abuse, parental neglect, and "lack of youthful guidance" in connection with

3   sentencing. *See, e.g.*, *United States v. Roe*, 976 F.2d 1216, 1218 (9th Cir. 1992) (holding that a

4   downwards departure would be appropriate due to the defendant's long history of childhood

5   sexual abuse and parental neglect); *U.S. v. Walter*, 256 F.3d 891, 894 (9th Cir. 2001) (history of

6   childhood sexual abuse and introduction to alcohol by parents at young age constitutes

7   "extraordinary circumstances" that justify consideration of the psychological effects of childhood

8   abuse for purposes of a downward departure); *United States v. Floyd*, 945 F.2d 1096, 1101 (9th

9   Cir. 1991) (holding that courts may depart downwards for "lack of youthful guidance" based on

10  parental neglect and isolation from society). Shasta's story mirrors many of the conditions in

11  these cases that courts have found to constitute "extraordinary circumstances." *Roe*, 976 F.2d at

12  1218.

13  Case law on downward departures for non-production CSAM offenses, autistic

14  defendants, defendants susceptible to abuse in prison, and defendants who have a history of

15  childhood sexual abuse all support a sentence of 48-months.

16  //

17  //

18

19

20

21

22

23

24

25

26

27

28

## VIII.    CONCLUSION

Shasta's history of childhood trauma and sexual abuse, coupled with her autism diagnosis, significantly inform the circumstances surrounding her case. Her story mirrors research on autistic and female sexual offenders that suggests the reason for offense has more to do with mental health, past trauma, and autistic characteristics than with anti-social tendencies or deviance. These very same characteristics make prison dangerous for Shasta. Her responsiveness to treatment, the high statistical unlikelihood that she will reoffend or escalate to a contact offense, and the increasing understanding that autism is a significant mitigator in these types of cases, make a lengthy custodial sentence inappropriate here. Shasta takes full responsibility for the harm she has caused, and respectfully asks the court for a sentence of 48-months in light of all of these mitigating factors.

Dated: August 26, 2024                        Respectfully submitted,

                                              HEATHER E. WILLIAMS
                                              Federal Public Defender

                                              */s/ Rachelle Barbour*
                                              RACHELLE BARBOUR
                                              Assistant Federal Defender
                                              Attorneys for Defendant
                                              SHASTA LEA SCHNITTKER